UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
PROFESSOR ANTHONY ISENALUMHE
and PROFESSOR JEAN GUMBS,

                       Plaintiffs,

       -against-

PROFESSOR GEORGIA MCDUFFIE and
DR. EDISON O. JACKSON, President,
Medgar Evers College,

                      Defendants.

----------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 06-CV-1076 (FB) (ALC)

*Appearances:*
*For the Plaintiffs:*
ANTHONY C. OFODILE, ESQ.
498 Atlantic Avenue
Brooklyn, NY 11217

*For the Defendants:*
ANDREW M. CUOMO, ESQ.
Attorney General of the State of New York
By: STEVEN LEON BANKS, ESQ.
    Assistant Attorney General
120 Broadway, 24th Floor
New York, NY 10271

**BLOCK, Senior District Judge:**

        Plaintiffs, Anthony Isenalumhe ("Isenalumhe") and Jean Gumbs ("Gumbs"), are

tenured nursing professors at Medgar Evers College ("MEC"), part of the City University of New

York ("CUNY"). Proceeding under 42 U.S.C. § 1983, they allege that defendant Georgia McDuffie

("McDuffie") retaliated against them for exercising their First Amendment rights, and that defendant

Edison O. Jackson ("Jackson") condoned McDuffie's actions. They seek compensatory and punitive

damages, as well as an injunction prohibiting further retaliation.[1]

---

[1] Plaintiffs have not specified whether defendants are sued in their individual capacities, their official capacities, or both. As defendants correctly point out, § 1983 allows official-capacity suits for prospective injunctive relief, but not for retrospective relief or money damages. *See Huminski v. Corsones*, 396 F.3d 53, 70 (2d Cir. 2005) ("[S]tate officials cannot be sued in

Pursuant to Federal Rule of Civil Procedure 56, defendants move for summary judgment. As explained below, the Court concludes that plaintiffs' suit is nothing more than an attempt -- regrettably all too common -- to dress an internecine feud in First Amendment garb; whatever the merits of the dispute, it is not one of constitutional magnitude. Accordingly, defendants' motion is granted.

## I

Isenalumhe has been a professor at MEC since 1993, with tenure since 1999. Gumbs was hired as a professor in 1998 and received tenure in 2000. Jackson has been the president of MEC since 1989.

The genesis of this lawsuit was the hiring of McDuffie as an associate professor and chairperson of the Nursing Department in 2001. She was elevated to the rank of full professor later in 2001 and reappointed with tenure in 2004. Isenalumhe and Gumbs opposed McDuffie's appointment and took issue with her administration shortly after her arrival. Their discontent manifested itself in a series of statements, emails, memos and letters opposing McDuffie's actions.

In enumerating the list of complaints and their allegedly retaliatory consequences, plaintiffs' complaint takes a blunderbuss approach. In addition, the list is something of a moving target, with new allegations arising in the course of discovery and, most recently, in plaintiffs' affidavits opposing defendants' motion for summary judgment.

---

their official capacities for retrospective relief under section 1983. . . . Nonetheless, state officials can be subject to suit in their official capacities for injunctive or other prospective relief." (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 & n.10 (1989))). There is no analogous limitation on individual-capacity suits. *See id.* ("Suit can also be brought against [defendants] under section 1983 in their individual capacities for both prospective and retrospective relief."). Accordingly, the Court construes all claims against defendants as individual-capacity claims, but only those seeking prospective injunctive relief as official-capacity claims. As the remainder of this memorandum and order makes clear, defendants are not liable to plaintiffs in either capacity.

In such cases, oral argument provides much-needed focus and insures that the Court does not overlook matters that may take on new life in a motion for reconsideration or on appeal. Accordingly, the Court held oral argument on September 29, 2009, and took great pains to establish a binding, exhaustive list of plaintiffs' claims. *See* Tr. of Sept. 29, 2009, at 24 ("THE COURT: Do we have everything now. MS. POLIAS [plaintiffs' counsel]: I think so, Your Honor. THE COURT: You will be held to it."); *see United States Trust Co. v. Shapiro*, 835 F.2d 1007 (2d Cir. 1987) (attorney bound by concession made at oral argument). That list forms the basis for the following background, presented in the light most favorable to plaintiffs. *See Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) ("When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.").[2]

## A. Isenalumhe's Individual Complaints

In 2002, Isenalumhe accused McDuffie of falsifying the results of the Nursing Department's elections for departmental and college-wide committees. The accusation was made at a department meeting at which most of the faculty was present. Shortly thereafter, Isenalumhe repeated his accusation in a letter to Jackson; MEC's Provost, Dominic Nwasike ("Nwasike"); and the grievance officer of CUNY's faculty union, Dr. John Flowers ("Flowers").

In the spring of 2003, McDuffie reassigned Isenalumhe's preferred courses, which he "had taught for years," Isenalumhe Aff. ¶ 11, to other faculty members with less seniority. That semester, McDuffie assigned Isenalumhe to teach only clinical sections, a course load that, according to Isenalumhe, was more befitting an adjunct than a full professor. *See id.* Isenalumhe complained about the assignment in a February 10, 2003 memo to McDuffie, with copies to Jackson, Nwasike

---

[2]Although the list of plaintiffs' claims was developed at oral argument, the Court relies on the parties' affirmations and affidavits for the details of the list items.

3

and Dr. Hiroko Karan ("Karan"), the dean of the School of Science, Health and Technology. *See* Ofodile Affirmation, Ex. 22.

For the fall semester of 2003, McDuffie assigned Isenaluhme to teach a clinical course in medical-surgical nursing. Believing himself unqualified to teach the course, on July 9, 2003, Isenaluhme left McDuffie a phone message questioning the assignment; receiving no response, he wrote her a letter on August 11, 2003, urging her to reconsider her decision. Isenalumhe then repeated his concerns in (1) an August 26, 2003 letter to Jackson (with copies to McDuffie, Nwasike, Karan and Flowers), and (2) an October 14, 2003 letter to Jackson (with copies to McDuffie, Nwasike, Karan and Flowers, as well as CUNY Vice Chancellor, Dr. L. Mirrer ("Mirrer"), and the chairperson of the MEC chapter of the faculty union, Dr. E. Catapane ("Catapane")).

For the spring semester of 2004, McDuffie assigned one assistant instructor to Isenalumhe's 22-student clinical course; according to Isenalumhe, "State law/regulations" require an instructor for every 10 students. Isenalumbe Aff. ¶ 41. He complained orally to McDuffie, Catapane and Flowers.

The understaffing resulted in several student complaints. Isenalumhe contends that the deputy department chair, Helen Murray ("Murray"), encouraged the students to write "blasphemous" allegations against him. Isenalumhe Aff. ¶ 43. He further contends that Murray violated protocol by not first referring the students to him, and by allowing the students to submit their written complaints anonymously. Finally, he contends that McDuffie "spirited" the complaints to Jackson without first attempting to resolve them at lower levels, in violation of school practice. Isenalumhe orally complained about the handling of the complaints to Catapane and Flowers.

As a result of the complaints, McDuffie assigned Dr. Eileen McCarroll ("McCarroll") to conduct a peer evaluation of Isenalumhe. Isenalumhe avers that such evaluations are unheard of

for tenured professors and, further, that the evaluation was carried out without prior notice to him and in a way that humiliated him in front of his students. Isenalumbe contends that Murray's handling of the student complaints and McCarroll's handling of the peer evaluation caused his students to lose respect for him and to become "unruly." Isenalumhe Aff. ¶ 45.

On May 29, 2004, Isenalumhe wrote a lengthy email to Flowers grieving the understaffing of his class, the handling of the student complaints and the peer evaluation. In the email, Isenalumhe claimed that he had been "the victim of systematic witch hunting, harassment and intimidation, perpetrated by the authorities of the Department of Nursing and the College." Ofodile Affirmation, Ex. 11. He asserted that he was "entitled to the performance of [his] duties in an atmosphere free of such contrived adversities." *Id.*[3]

For the fall semester of 2004, McDuffie once again assigned Isenalumhe to teach medical-surgical nursing, while assigning his preferred courses to faculty members with less seniority. In a May 29, 2004 email to McDuffie (with copies to Jackson, Nwasike and Karan), Isenalumhe asked to "be allowed to teach the courses [he] usually [taught]." Ofodile Affirmation, Ex. 24. In June 2004, he repeated his request to Karan in person. The medical-surgical course was eventually reassigned to someone else.

## B. Gumbs's Individual Complaints

While serving on the department's Curriculum Committee in 2003, Gumbs accused McDuffie, in private, of falsely representing to the college-wide committee that the departmental committee had voted favorably on proposed curriculum changes. Gumbs, along with other faculty

---

[3]Isenalumhe did not mention this incident in his deposition testimony; it was raised for the first time in his affidavit opposing summary judgment.

members, then complained orally to Karan.[4]

On January 11, 2005, Gumbs wrote to Nwasike (copying the acting registrar and the new Dean of the School of Science, Health and Technology, Dr. Moshin Patwary ("Patwary")) to complain that someone had, without her authorization, entered grades for one of her courses into MEC's computer system. Gumbs suspected McDuffie, the only other person who knew Gumbs's password to the system.

For the spring semester of 2005, Gumbs was assigned to a non-teaching, administrative position in MEC's Office of Research and Special Initiatives; she received a memorandum from Jackson informing her of the assignment. On February 1, 2005, Gumbs complained to Flowers, who then filed a formal grievance asserting that Gumbs's assignment violated CUNY's bylaws and its collective bargaining agreement with the faculty union. Gumbs eventually hired an attorney to pursue the grievance through the administrative process. Although the final result of the grievance proceeding is not clear from the record, counsel represented at oral argument that Gumbs returned to a teaching assignment. *See* Tr. at 15 ("MS. POLIAS: I don't know when the process happened, but it was that she was reinstated to teaching.").[5]

## C. Joint Complaints Regarding the Personnel and Budget Committee

Between 2003 and 2005, both Isenalumhe and Gumbs served on the Nursing Department's Personnel and Budget ("P&B") Committee. Throughout their respective terms on this

---

[4]In her affidavit opposing summary judgment, Gumbs avers that she also complained to Flowers. This is, however, inconsistent, with her deposition testimony that she complained only to McDuffie and Karan. "[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

[5]Gumbs did not mention the grievance during her deposition testimony; it was raised for the first time in her affidavit opposing summary judgment.

committee, they complained numerous times to McDuffie that she was bypassing the committee and unilaterally hiring, in their opinion, less qualified candidates. Plaintiffs repeated their complaints to Nwasike, Catapane, Flowers and colleagues in the Nursing Department.

In September 2003, Isenalumhe told Nwasike that McDuffie had reported false committee votes regarding hiring and promotion recommendations to the college-wide P&B Committee. At Nwasike's request, Isenalumhe, Gumbs and another committee member then sent the committee's voting record to Nwasike under a cover letter repeating the accusation. *See* Ofodile Affirmation, Ex. 6. The three professors raised the same accusation in September 2004, this time in conversations with, and in a letter to, Dr. Wilbert Hope ("Hope"), a member of the college-wide P&B Committee.

Also in September 2004, Isenalumhe and Gumbs, along with the two other members of the departmental P&B Committee, sent McDuffie a memo complaining about bias in her handling of faculty evaluations. They contended that McDuffie overlooked weaknesses in faculty members she favored, and strengths in faculty members she did not. They further claimed that instead of submitting all student evaluations to the committee, McDuffie had selectively submitted only those that bolstered her predilections. On November 8, 2004, the four wrote a memo to Nwasike (copying Jackson and Patwary), accusing McDuffie of tampering with the evaluation process.

**D. Joint Complaints Regarding the Departmental Reorganization**

By July 2005, the bad blood within the Nursing Department had motivated MEC to split the department into a Department of Nursing Bachelor of Science ("BSN") and a Department of Nursing Associate of Applied Sciences in Nursing and Practical Nursing Certificate Program ("AAS/PN"). McDuffie was appointed chairperson of the AAS/PN Department. Isenalumhe was assigned to the BSN Department, Gumbs to the AAS/PN Department.

The departmental reorganization generated another spate of complaints from Isenalumhe and Gumbs. Both complained to McDuffie, Jackson, Patwary, Catapane, Flowers and others that McDuffie had unceremoniously packed their belongings and evicted them from their respective offices. Isenalume avers that he was forced to use cubicles meant for adjuncts, without regular phone or computer access, while his books, teaching materials and personal belongings were kept in a separate room to which McDuffie refused to provide a key; he finally obtained a new office in the ninth week of the semester. For her part, Gumbs states that the filing cabinet containing her teaching materials was locked in her old office for several weeks, and that McDuffie refused to provide a key to the new office, causing Gumbs to leave her door unlocked; she complained several times that someone had apparently rummaged through her belongings.

On November 2, 2005, Isenalumhe and Gumbs co-wrote a letter to CUNY Chancellor Matthew Goldstein ("Goldstein"). The letter reiterated Isenalumhe's complaint regarding his office space and Gumbs's complaint regarding her assignment to a non-teaching position the previous spring.[6] The letter concluded by asking Goldstein to "(1) grant [Isenalumhe and Gumbs] a short audience to explain [their] desperate situation and (2) do whatever is necessary to end Dr. McDuffie's harassment and its trauma on all affected." Ofodile Affirmation, Ex. 16.

The Chancellor's Office of Faculty and Staff Relations referred the complaint to MEC's Affirmative Action Officer, Dr. Charlotte Phoenix ("Phoenix"). Phoenix was to investigate the complaint, with the Chancellor's Office "monitor[ing] the process of the investigation." *Id.* The investigation apparently stalled because Isenalumbe and Gumbs did not believe that "a reliable investigation of the issue [could] be conducted by any staff of Medgar Evers College." *Id.*

---

[6]The letter also set forth a third professor's complaint regarding office access.

Isenalumhe declined Phoenix's invitation to meet with her. Gumbs, however, met with Phoenix to request a transfer from the AAS/PN Department to the BSN Department, and a promotion to associate professor. The request for a transfer with granted in 2006; the request for a promotion apparently did not bear fruit, as Gumbs continues to serve as an assistant professor.

## E. The Lawsuit and Subsequent Events

Isenalumhe and Gumbs filed the present lawsuit in March 2006; they contend that the pursuit of the suit itself constitutes protected speech under the First Amendment.

In the fall of 2006, Jackson created a new position -- "Associate Dean of Nursing and Allied Health" -- and conferred the title on McDuffie. Jackson directed the chairs of both nursing departments to report to the new associate dean.

On October 10, 2007, Isenalumhe -- now the chairperson of the BSN department -- sent Jackson an email complaining that McDuffie was using her new position to subvert his authority over departmental matters. In the email, Isenalumhe asked Jackson to "allow the chairperson and members of faculty of the BSN dept to resume direct communication with the Dean and the Provost." Ofodile Affirmation, Ex. 3. Isenalumhe sent a hard copy of the email to Brooklyn Borough President Marty Markowitz ("Markowitz"), with a request that Markowitz use his "influence with [Jackson] to correct the dysfunctional situation noted above." *Id.*

## F. Alleged Retaliation

Plaintiffs make no effort to attribute particular instances of retaliation to particular instances of protected speech. Instead, they contend that their allegedly protected speech, taken as a whole, led to a retaliatory hostile work environment consisting of numerous retaliatory actions. The actions fall into two categories: (1) actions about which plaintiffs complained, giving rise to one of the instances of allegedly protected speech set forth above, and (2) actions which did not themselves

generate any complaints for which plaintiffs claim First Amendment protection. The former category includes:

- McDuffie's reassignment of Isenalumhe's preferred courses to faculty members with less seniority in the spring of 2003 and fall of 2004;

- McDuffie's assignment of Isenalumhe to teach medical-surgical nursing in the fall of 2003, and again in the fall of 2004;

- McDuffie's understaffing of Isenalumhe's course in the spring of 2004;

- McDuffie's allegedly improper handling of the student complaints resulting from the understaffing;

- McDuffie's alleged complicity in entering grades for one of Gumbs's courses without her authorization in January 2005;

- McDuffie's assignment of Gumbs to a non-teaching position in the spring of 2005;

- McDuffie's alleged refusal to provide Isenalumhe with office space and his teaching materials in the fall of 2005;

- McDuffie's alleged refusal to provide Gumbs access to her filing cabinet and a key to her new office in the fall of 2005; and

- Jackson's appointment of McDuffie as associate dean, and McDuffie's alleged abuse of that position.

The latter category consists of the following allegedly retaliatory actions:

- In November 2003, Jackson threatened to "de-tenure" Gumbs.

- In the spring of 2004, McDuffie continued to assign adjuncts to teach Gumbs's courses after the latter returned from medical leave, and instead gave Gumbs an administrative assignment.

- In the spring of 2004, McDuffie improperly handled student complaints about Gumbs.

- In the fall of 2004, McDuffie assigned Gumbs's preferred courses to faculty members with less seniority and assigned her to teach a clinical course far from her home and on Sundays (her day of worship).

- McDuffie changed the locks to the department's office suite in the spring of 2005, and refused to provide Isenalumhe and Gumbs with the keys.

- At some unspecified time, McDuffie told Gumbs she would not recommend her for a promotion to associate professor.

- Isenalumhe's home number was blocked on the department's telephone system and his email account was subjected to several "assaults." He "strongly suspects" McDuffie is responsible because her husband is the head of the IT Department at MEC.

Finally, in addition to pursuing a hostile environment theory, plaintiffs contend that certain elements of the allegedly hostile environment were sufficiently adverse to constitute stand-alone retaliatory actions. In that regard, Gumbs relies on her administrative assignment in the spring of 2005; Isenalumhe relies on (1) his assignment to teach medical-surgical nursing in the fall of 2003, and (2) his inability to access his office and teaching materials in the fall of 2005. *See* Tr. at 53 (referring Court to plaintiffs' memorandum of law); Pls.' Mem. of Law at 46-48 (listing stand-alone adverse employment actions).

## II

"Where the plaintiff is a public employee alleging that he suffered an adverse employment action as retaliation for the exercise of his First Amendment rights, a plaintiff must initially show that (1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest, (2) he or she suffered an adverse employment action, and (3) the speech was at least a substantial or motivating factor in the [adverse employment action]." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (citation, internal quotation marks and alterations omitted). If the plaintiff makes this *prima facie* showing, the burden shifts to the employer to justify the adverse action; this may be done in one of two ways.

First, the employer may "demonstrat[e] by a preponderance of the evidence that it would have taken the same adverse action in the absence of the protected speech." *Mandell v. County*

*of Suffolk*, 316 F.3d 368, 382 (2d Cir. 2003).  Second, the employer may invoke the balancing test

of *Pickering v. Board of Education*, 391 U.S. 563 (1968), which seeks "the most appropriate possible

'balance between the interests of the [employee], as a citizen, in commenting upon matters of public

concern and the interest of the State, as an employer, in promoting the efficiency of the public

services it performs through its employees.'" *Meltzer v. Bd. of Educ.*, 336 F.3d 185, 192 (2d Cir.

2003) (quoting *Pickering*, 391 U.S. at 568).

Defendants argue that plaintiffs have failed to establish any of the three elements of

their *prima facie* case.  In addition, they argue that the alleged adverse actions would have been taken

regardless of plaintiffs' speech.  Finally, they raise several other arguments: (1) that they are entitled

to qualified immunity, (2) that the applicable statute of limitations bars consideration of any adverse

actions occurring before March 6, 2003 (i.e., more than three years prior to the filing of the

complaint), and (3) that plaintiffs have failed to adduce sufficient evidence that Jackson was

personally involved in any retaliation.  Defendants do not, however, argue that the adverse actions

were justified under *Pickering* balancing.

For the following reasons, the Court holds that plaintiffs have failed to make out a

*prima facie* case of First Amendment retaliation.  With respect to plaintiffs' pre-lawsuit speech, the

Court concludes that plaintiffs either did not speak as citizens or did not speak on matters of public

concern.  With respect to the filing of the lawsuit and post-lawsuit speech, the Court concludes that

plaintiffs have not established that they were subject to retaliation, in the form of either stand-alone

adverse employment actions or a hostile work environment.

### III

Determining whether a public employee's speech is protected by the First Amendment

is a two-part inquiry: (1) Did the employee speak as a citizen? and (2) Did the employee speak on

a matter of public concern?  Thus, "[i]f the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'"  *Sousa v. Roque*, 578 F.3d 164, 170 (2d Cir. 2009) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  "The inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers*, 461 U.S. 138, 148 n. 7 (1983) (internal citations omitted).

## A. Citizen Speech Versus Employee Speech

*Garcetti* – the Supreme Court's latest pronouncement on First Amendment retaliation claims – addressed what it means to speak "as a citizen"; it holds that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes." *Id.* at 421.  The high court noted, however, that speech is not automatically excluded from First Amendment protection merely because it occurs in the workplace, *see id.* at 420 ("That Ceballos expressed his views inside his office, rather than publicly, is not dispositive."), or because it concerns the subject-matter of the speaker's employment, *see id.* ("The First Amendment protects some expressions related to the speaker's job.").

The Second Circuit recently applied *Garcetti* in *Weintraub v. Board of Education*, 593 F.3d 196 (2d Cir. 2010).  The plaintiff in *Weintraub*, a public school teacher, complained about an assistant principal's handling of a disruptive student.  The complaints were made to the plaintiff's colleagues and to the assistant principal himself, and culminated in the filing of a grievance with the plaintiff's union; the plaintiff claimed that he had been harassed and, ultimately, terminated in retaliation for his speech.

In the district court, Judge Glasser grouped the plaintiff's speech into three categories: (1) complaints to colleagues, (2) complaints to the assistant principal, and (3) the filing of the

grievance. *See Weintraub v. Board of Educ.*, 489 F. Supp. 2d 209, 214 (E.D.N.Y. 2007). Applying *Garcetti*, he concluded that the first category involved citizen speech because "[the plaintiff's] conversations with other teachers about his conflict with [the assistant principal] are clearly not within the scope of his employment duties." *Id.* at 220. With respect to the second and third categories, by contrast, Judge Glasser held that "[i]n both instances, [the plaintiff] was speaking as an employee, proceeding through official channels to complain about unsatisfactory working conditions." *Id.* at 219-20.

Judge Glasser certified his decision for interlocutory appeal. The Second Circuit accepted jurisdiction, but limited its consideration to the filing of the grievance. *See Weintraub*, 593 F.3d at 200. As a result, the circuit court did not pass upon Judge Glasser's holdings that the plaintiff spoke as a citizen in complaining to colleagues, but as an employee in complaining to his assistant principal.

In a 2-1 decision, with Judge Calabresi dissenting, the circuit court held that *Garcetti* barred plaintiff's claim because "by filing a grievance with his union to complain about his supervisor's failure to discipline a child in his classroom, [he] was speaking pursuant to his official duties and thus not as a citizen." *Id.* at 201. The majority read *Garcetti* to mean that speech can be "'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." *Id.* at 203.

In the majority's view, the plaintiff's grievance was "pursuant to his official duties" because it

> was part-and-parcel of his concerns about his ability to properly execute his duties as a public school teacher -- namely, to maintain classroom discipline, which is an indispensable prerequisite to effective teaching and classroom learning. [The plaintiff's] speech challenging the school administration's decision to not discipline a

> student in his class was a means to fulfill, and undertaken in the course
> of performing, his primary employment responsibility of teaching.

*Id.* (citations and internal quotation marks omitted). In addition, the majority found it significant that the plaintiff's speech "ultimately took the form of an employee grievance, for which there is no relevant citizen analogue":

> The lodging of a union grievance is not a form or channel of discourse available to non-employee citizens, as would be a letter to the editor or a complaint to an elected representative or inspector general. Rather than voicing his grievance through channels available to citizens generally, Weintraub made an internal communication made pursuant to an existing dispute-resolution policy established by his employer, the Board of Education. As with the speech at issue in *Garcetti*, Weintraub could only speak in the manner that he did . . . as a public employee.

*Id.*

In dissent, Judge Calabresi reasoned that the majority's reading of *Garcetti* was too broad, particularly in the context of public education, because "everything from a healthy diet to a two-parent family has been suggested to be necessary for effective classroom learning, and hence speech on a wide variety of topics might all too readily be viewed as 'in furtherance of' the core duty of encouraging effective teaching and learning." *Id.* at 205-06. He also found unpersuasive the lack of a "relevant citizen analogue." *Id.* at 206 ("The idea that the existence of citizen analogues is a prerequisite for suit seems contradicted by *Garcetti*'s statement that the fact that a public employee 'expressed his views inside his office, rather than publicly, is not dispositive.'" (quoting *Garcetti*, 547 U.S. at 420)). Overall, Judge Calabresi expressed deep concern that the majority's approach would "permit readings that would allow retaliation against much speech that seems to me to require protection and to remain protected after *Garcetti*." *Id.*

## B.  Matters of Public Concern

Even when a public employee is speaking as a citizen, his or her speech is protected only if it involved a matter of public concern.  A matter of public concern is one that can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146.  In making this assessment, the district court must "tak[e] into account the content, form, and context of a given statement as revealed by the whole record." *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999*).*

The definition of "matters of public concern" has been rightly described as "capacious." *Rafiy v. Nassau County Med. Ctr.*, 218 F. Supp. 2d 295, 306 (E.D.N.Y. 2002).  The Supreme Court has cautioned, however, that speech is not protected simply because it relates to the workings of a public entity:

> To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark -- and certainly every criticism directed at a public official -- would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Connick*, 461 U.S. at 149.

In *Ruotolo v. City of New York*, 514 F.3d 184 (2d Cir. 2008), the Second Circuit described the "heart" of the public concern inquiry as "whether the employee's speech was 'calculated to redress personal grievances or whether it had a broader public purpose.'" *Id.* at 189 (quoting *Lewis*, 165 F.3d at 163-64).  A year later, however, the court clarified that "the speaker's motive, while one factor that may be considered, is not dispositive as to whether his speech addressed a matter of public concern," *Sousa v. Roque*, 578 F.3d 164, 171 (2d Cir. 2009) (quoting *Reuland v.*

*Hynes*, 460 F.3d 409, 415 (2d Cir. 2006)); that is, "it does not follow that a person *motivated* by a personal grievance cannot be speaking on a matter of public concern." *Id.* at 174. Notwithstanding that admonition, the circuit court adhered to the principle that "[a]n employee who complains solely about his own dissatisfaction with the conditions of his own employment is speaking 'upon matters only of personal interest.'" *Id.* (quoting *Connick*, 461 U.S. at 147).

## C. Application

Given the sheer volume of plaintiffs' complaints, it is helpful -- if not necessary -- to group plaintiffs' speech into categories, as Judge Glasser did in *Weintraub*. The Court begins by categorizing plaintiffs' complaints as pre-lawsuit speech and post-lawsuit speech (including the filing of the lawsuit itself).

### 1. Pre-Lawsuit Speech

Plaintiffs' pre-lawsuit complaints can be subdivided into (1) complaints to Catapane and Flowers, (2) complaints regarding committee matters, and (3) complaints regarding work assignments and conditions. The first two categories do not involve citizen speech, while the third does not touch upon matters of public concern.

### a. Complaints Not Involving Citizen Speech

Any complaints to Catapane or Flowers -- that is, the faculty union representative and grievance officer -- lack a "relevant citizen analogue." *Weintraub*, 593 F.3d at 203. Thus, as in *Weintraub*, plaintiffs could make those complaints only as public employees.

The Court further concludes that a second category -- namely, plaintiffs' accusations that McDuffie interfered with various committee matters[7] – involved employee, as opposed to citizen,

_____

[7]That is: (1) Isenalumhe's 2002 complaint that McDuffie misrepresented the results of faculty committee elections, (2) Gumb's 2003 complaint that McDuffie misrepresented the

17

speech.  In contrast to the previous category, the Court's conclusion follows not from *Weintraub*'s holding, but rather from its rationale.

Many of the complaints in this category were explicitly lodged by plaintiffs (sometimes with others) *as committee members.*  Moreover, all of the complaints contended that McDuffie was undermining the committee process.  These facts demonstrate that plaintiffs' complaints were "undertaken in the course of performing" their responsibilities as committee members; that is, they were "part-and-parcel" of plaintiffs' concerns about their ability to properly execute their duties as faculty members elected to, and serving on, various committee.  *Weintraub*, 593 F.3d at 203; *accord Ezuma v. City Univ. of N.Y.*, 665 F. Supp. 2d 116, 129-30 (E.D.N.Y. 2009) (Cogan, J.) (holding that professor's reports of sexual harassment were "wholly referable to the performance of his official functions" as department chair), *aff'd*, 2010 WL 605732 (2d Cir. Feb. 22, 2010).[8]

Plaintiffs argue that their job duties did not require them to serve on committees or to report wrongdoing.  The fact remains, however, that plaintiffs did serve on the committees; in so doing, plaintiffs took on the responsibility of discharging the duties of those committees and, if necessary, bringing to light matters that interfered with their operations.  *Cf. Battle v. Board of*

results of a Curriculum Committee vote, (3) plaintiffs' joint complaints in 2003 and 2004 that McDuffie misrepresented the results of a P&B Committee vote, (4) plaintiffs' joint complaint in 2004 that McDuffie tampered with the P&B Committee's evaluation process, and (5) plaintiffs' repeated complaints that McDuffie bypassed the P&B Committee's role in the hiring process.

[8]The circuit court affirmed, by summary order, "for substantially the reasons stated in the district court's thorough and well-reasoned opinion."  2010 WL 605732, at *1.  It added, however, that a matter of concern to the academic community does not automatically translate into a "matter of public concern."  *See id.* ("[O]n the particular facts of this case, [the plaintiff's] colleague's failure to obtain a doctoral degree from a properly accredited university was a matter of concern within the academic community and not the public at large.").  Although not precedential, summary orders may be cited as persuasive authority.  *See* Fed. R. App. P. 32.1.

*Regents*, 468 F.3d 755, 761 n.6 (11th Cir. 2006) ("Regardless of whether Plaintiff had a duty to look for fraud, these assertions do not alter the uncontroverted fact that once Plaintiff did discover mismanagement or fraud within any of the student files, she had a clear duty to report this information.  The issue in *Garcetti* was whether a public employee was speaking pursuant to an official duty, not whether that duty was part of the employee's everyday job functions.").

### b.  Complaints Not Involving Matters of Public Concern

The remainder of plaintiffs' pre-lawsuit speech consists of complaints to higher-ups within their department (McDuffie herself), school (Deans Karan and Patwary), college (Jackson and Provost Nwasike) and university (Vice-Chancellor Mirrer and Chancellor Goldstein).  In *Weintraub*, Judge Glasser read several out-of-circuit cases applying *Garcetti* to stand for the proposition that "when a public employee airs a complaint or grievance, or expresses concern about misconduct, to his or her immediate supervisor or pursuant to a clear duty to report imposed by law or employer policy, he or she is speaking as an employee and not as a citizen."  489 F. Supp. 2d at 219 (citing *Spiegla v. Hull*, 481 F.3d 961 (7th Cir. 2007); *Casey v. West Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323 (10th Cir. 2007); *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006); and *Mills v. City of Evansville*, 452 F.3d 646 (7th Cir. 2006)).  Other cases read *Garcetti* even more broadly.  *See, e.g., Bivens v. Trent*, 591 F.3d 555, 560 (7th Cir. 2010) ("[U]nder *Garcetti*, it is clear that the complaints about lead contamination that Bivens made directly up the chain of command to his supervisors are not protected by the First Amendment."); *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 693 (5th Cir. 2007) (holding that *Garcetti* barred claims involving speech "not necessarily required by [the plaintiff's] job duties but nevertheless . . . related to his job duties").

The Second Circuit did not address Judge Glasser's reading of *Garcetti* as it applied to complaints to supervisors.  The Court need not decide whether such a broad reading is the correct

one; assuming, *arguendo*, that plaintiffs spoke as citizens in making these complaints, the Court concludes that the complaints were not protected by the First Amendment because they did not involve matters of public concern.

Plaintiffs' remaining pre-lawsuit speech involved either their work assignments[9] or what may broadly be termed their working conditions.[10]  Per the Second Circuit's admonition in *Roque*, the Court considers plaintiffs' motivation -- which was plainly to redress personal grievances -- as relevant, but not dispositive.  What is dispositive is that the "content, form, and context," *Lewis,* 165 F.3d at 163, of the complaints confirm that plaintiffs were complaining about matters affecting them, and them alone.

To be sure, plaintiffs attempted to inject broader issues into their complaints: Isenalumhe asserted that assigning him to teach medical-surgical nursing put patients at risk; Gumbs contended that her administrative assignment violated CUNY bylaws, and  that having to leave her door unlocked compromised security.   But to allow these isolated comments to outweigh the overriding personal nature of the complaints would indulge the forbidden presumption that "all matters which transpire within a government office are of public concern."   *Connick*, 461 U.S. 138, 149 (1983); *see Ezekwo v. New York City Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991) ("Our review of [the plaintiff's] prolific writings convinces us that [she] was not on a mission to

---

[9]Iselalumhe complained about his assignments for the spring and fall semesters of 2003, and for the fall semester of 2004; Gumbs complained about her non-teaching assignment for the spring semester of 2005.

[10]Isenalumhe complained about the understaffing of one of his courses for the spring of 2004, as well as the handling of the resulting student complaints and peer evaluation.  Gumbs complained about the unauthorized entry of grades for one of her courses in the spring of 2005.  Both professors complained about McDuffie's handling of the logistics of the departmental reorganization in the fall of 2005.

protect the public welfare. Rather, her primary aim was to protect her own reputation and individual development as a doctor.").

## 2. The Lawsuit and Post-Lawsuit Speech

The foregoing analysis covers all of plaintiffs' many proffered instances of protected speech *except* the filing of the lawsuit and Isenalumhe's October 10, 2007 email to Jackson and Markowitz. Rather than address whether these are protected by the First Amendment, the Court disposes of them on the ground that plaintiffs have failed to establish that these instances of speech led to any retaliation.

First, it is apparent that plaintiffs' post-lawsuit speech bore no connection to what they claim as stand-alone adverse employment actions. Those actions took place between the fall of 2003 and the fall of 2005; the lawsuit was not filed until March 2006.

With respect to plaintiffs' hostile-environment theory, the Court acknowledges that such a claim exists in the Second Circuit. *See Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass."). The Court is also mindful that in the retaliation context, "critical mass" is reached if the employer's action "would deter an individual of ordinary firmness . . . from exercising his free speech rights." *Zelnik*, 464 F.3d at 227. Nevertheless, the Court agrees with Judge Cogan's conclusion in *Ezuma* that a retaliatory hostile environment, to be actionable, must be "severe and pervasive." 665 F. Supp. 2d at 126-27.

Gumbs does not identify any post-lawsuit retaliation. Isenalumhe points only to McDuffie's appointment as associate dean. The Court concludes that this isolated action -- even if taken in response to the filing of the lawsuit -- is insufficient to establish a retaliatory hostile work environment. *See id.* at 127 ("No reasonable jury could find that the handful of disconnected acts that

he suffered were 'severe or pervasive' enough that a reasonable person would find his environment hostile or abusive." (citing *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)).

With respect to the October 10, 2007 email to Jackson and Markowitz, Isenalumhe does not identify *any* subsequent action taken in response to the speech. Moreover, the email bears all the hallmarks of a personal grievance, inasmuch as Isenalumhe explicitly complained that McDuffie was using her new position to subvert *his* authority as department chair; therefore, it did not address a matter of public concern.

**IV**

In *Ezuma*, Judge Cogan described the dispute between plaintiff and defendant as "open academic warfare." 665 F. Supp. 2d at 130. The metaphor is equally apt here: What began as plaintiffs' displeasure with McDuffie's appointment has become a nearly ten-year war of attrition.

There may be circumstances in which such struggles implicate the First Amendment, as when it involves what may and may not be taught in a public university. Indeed, the Supreme Court has suggested that the *Garcetti* inquiry may not apply "in the same manner to a case involving speech related to scholarship or teaching." 547 U.S. at 425. Here, however, the speech at issue involves a string of complaints by faculty members unhappy with the administration of their department. While the complaints may well be justified, the First Amendment does not transform a federal court into a battleground for their resolution. *See Connick*, 461 U.S. at 147 ("[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.").

Defendants' motion for summary judgment is granted. Plaintiffs' complaint is

dismissed in its entirety.[11]

**SO ORDERED.**

 

 

 

 

                                             _____
                                             FREDERIC BLOCK
                                             Senior United States District Judge

Brooklyn, NY
March 17, 2010

---

[11]In light of this disposition, the Court need not address defendants' other grounds for summary judgment.